[No. A136573. First Dist., Div. One. Mar. 13, 2015.]

THE PEOPLE, Plaintiff and Respondent, v.
LAMAR JOHNSON, Defendant and Appellant.

[Nos. A140310, A143775. First Dist., Div. One. Mar. 13, 2015.]

In re LAMAR JOHNSON on Habeas Corpus.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.

## COUNSEL

Michele Kemmerling, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Lawrence K. Sullivan and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUMES, P. J.**—Lamar Johnson was involuntarily committed to a state mental hospital after a jury found him to be a sexually violent predator (SVP). He appealed, and he later filed two petitions for a writ of habeas corpus. We consolidated the actions after issuing orders to show cause. In his appeal, Johnson argues (1) insufficient evidence supports the jury's determination that he is an SVP; (2) the jury was improperly instructed on the burden of proof; and (3) the Sexually Violent Predator Act (the SVPA or Act)[1] is unconstitutional. In both habeas corpus petitions, he argues that his commitment must be vacated because the newest edition of the Diagnostic and Statistical Manual of Mental Disorders[2] (DSM), a manual published by the American Psychiatric Association to identify criteria for the classification of mental disorders, does not allude to the psychiatric diagnosis upon which his commitment was based: "paraphilia[,] not otherwise specified, . . . with non-consenting persons." We reject these arguments, affirm the judgment, and in the published portion of our decision deny the habeas corpus petitions.

### I.

### BACKGROUND

#### A. *The Statutory Background.*

Under the SVPA, a person who is found to be an SVP beyond a reasonable doubt by a unanimous jury may be involuntarily committed to a state mental hospital for an indefinite term. (§§ 6603, subd. (d), 6604.) The statute defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."[3] (§ 6600, subd. (a)(1).)

---

[1] Welfare and Institutions Code section 6600 et seq. All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (sometimes referred to as the DSM-5).

[3] As originally enacted (Stats. 1995, ch. 763, § 3, p. 5922), the SVPA set a two-year term of involuntary confinement that could be extended. (Former §§ 6600, subd. (a), 6604.) In 2006, California voters passed Proposition 83, which changed the term to be an indefinite period of

SVPs are entitled to have their mental conditions examined once per year (§ 6604.9, subd. (a)), and they can obtain release in two ways. First, if the State Department of State Hospitals (DSH) determines that the SVP's diagnosed mental disorder "has so changed that the person is not likely to commit acts of predatory sexual violence while under supervision and treatment in the community," the DSH must forward a report and recommendation for conditional release, and the trial court must set a hearing to consider conditional release. (§ 6607, subd. (a).) Second, the SVP may petition the court for a conditional release with or without the concurrence of the DSH. (§ 6608, subd. (a).) Upon receiving a petition filed without the DSH's concurrence, the court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (*Ibid.*) If the court determines the petition is not frivolous, it must set a hearing. (§ 6608, subds. (b)(1) & (4), (c)(1).) If the SVP's petition is denied, the SVP may not file a new application until one year has elapsed from the date of the denial. (§ 6608, subd. (j).)

At a hearing to consider an SVP's conditional release, the trial court must determine whether "it is likely that [the committed person] will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community." (§ 6608, subd. (g).) Ordinarily, the burden is on the SVP to prove by a preponderance of the evidence that conditional release is appropriate. (§ 6608, subd. (k).) But when the DSH issues a report stating that "conditional release to a less restrictive alternative is in the best interest of the person and that conditions can be imposed that would adequately protect the community," the burden is on the state to prove by a preponderance of the evidence that conditional release is not appropriate. (*Ibid.*)

Not surprisingly, the constitutionality of the SVPA and other states' civil commitment schemes has been challenged. Our state Supreme Court has upheld the SVPA against due process and equal protection challenges, and it did so by adopting the same analysis that applies under the United States Constitution. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1152, fn. 19 [81 Cal.Rptr.2d 492, 969 P.2d 584].) Under both the federal and state Constitutions, a finding of dangerousness alone is insufficient to justify an involuntary commitment. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 356–357 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*); see *Hubbart*, at p. 1152, fn. 19.) Rather, a state can only involuntarily commit someone who has a

---

commitment. (*People v. McKee* (2010) 47 Cal.4th 1172, 1183–1184 [104 Cal.Rptr.3d 427, 223 P.3d 566].) In addition, although it originally required an SVP to have committed sexually violent offenses against two or more victims, the SVPA now requires only one victim. (§ 6600, subd. (a)(1).)

"serious mental illness, abnormality, or disorder" that separates the person "from the dangerous but typical recidivist convicted in an ordinary criminal case." (*Kansas v. Crane* (2002) 534 U.S. 407, 413 [151 L.Ed.2d 856, 122 S.Ct. 867] (*Crane*).) "If . . . civil confinement were to become a mechanism for retribution or general deterrence, or if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it." (*Hendricks*, at p. 373 (conc. opn. of Kennedy, J.); see *Crane*, at p. 412.)

## B. *The Factual Background.*

Between 1983 and 1992, Johnson committed sexually violent offenses against three victims. In 1984, he pleaded guilty to one count of assault with intent to commit rape (Pen. Code, §§ 220, 261) of a 24-year-old woman. While he was awaiting sentencing for that crime, he raped a 15-year-old girl who lived in his apartment complex, and he later pleaded guilty to unlawful sexual intercourse with a minor (Pen. Code, § 261.5). He served time in prison for those two convictions but was released on parole in May 1985. In March 1992, Johnson sexually assaulted yet another woman, and he was subsequently convicted of two counts of rape (Pen. Code, § 261, subd. (a)) and one count each of assault with intent to commit sodomy (Pen. Code, §§ 220, 286), forcible oral copulation (Pen. Code, § 288a), and assault with intent to commit rape (Pen. Code, §§ 220, 261). He was sentenced to state prison for 36 years and remained incarcerated for over 17 years, but he was scheduled to be released on parole on June 28, 2011.

The day before Johnson's scheduled release date, the San Mateo County District Attorney petitioned to have Johnson committed to a state hospital as an SVP. A jury trial ensued, and four psychologists testified as experts: Deirdre D'Orazio, Ph.D., and Jesus Padilla, Ph.D., testified for the state, and Brian Abbott, Ph.D., and Christopher Heard, Ph.D., testified for Johnson.

The state's experts, Drs. D'Orazio and Padilla, diagnosed Johnson with "paraphilia[,] not otherwise specified, . . . with non-consenting persons." We shall follow the lead of at least one of the experts who testified below and will refer to this diagnosis as "paraphilic coercive disorder." The state's experts relied on several factors in forming the diagnosis, and they generally described it as marked by sexual arousal or gratification involving nonconsenting persons persisting over a six-month period. Johnson did not object to the introduction of this testimony, and his counsel cross-examined both doctors.[4]

---

[4] The state's experts also diagnosed Johnson with substance dependence and a personality disorder marked by narcissistic and antisocial traits. The Attorney General does not argue that these diagnoses provide an independent basis for Johnson's commitment.

Johnson's experts disagreed with the state's experts about Johnson's diagnosis. Dr. Abbott testified that, although it can be a valid diagnosis, paraphilic coercive disorder is very rare, was not listed in the then current edition of the DSM, and is controversial within the scientific community. He opined that Johnson does not have the disorder, and he questioned the factors relied upon by the state's experts in diagnosing Johnson with it. Dr. Heard testified that paraphilic coercive disorder does not exist and that an overwhelming majority of psychologists and psychiatrists has rejected it as a valid diagnosis. He further testified that, even if the disorder does exist, there is no consensus on its definition or diagnosis, and none of the factors on which the state's experts relied to diagnose Johnson with the disorder had been validated by research. Dr. Heard opined that Johnson was motivated not by paraphilia but by anger toward women, which he expressed in a violent, antisocial manner.

The edition of the DSM current at the time of Johnson's trial was the text revision of the fourth edition, published in 2000.[5] It states that "[t]he essential features of a Paraphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months." This edition of the DSM identifies eight classifications of paraphilia and also references a residual category, "Paraphilia Not Otherwise Specified," which includes paraphilias that are less frequently encountered. The state's experts asserted that paraphilic coercive disorder falls within this residual category. After the trial, the American Psychiatric Association published a fifth edition of the DSM, DSM-5. The description of paraphilia in DSM-5 does not reference "nonconsenting persons" as did the fourth edition's, and DSM-5 does not otherwise allude to paraphilic coercive disorder.[6]

The experts also disagreed about Johnson's risk of engaging in sexual violence if released. To assess Johnson's risk of reoffense, Dr. D'Orazio used the Static-99R, an actuarial instrument based on studies of known sex offenders that identifies factors related to reoffense. Dr. D'Orazio also used another instrument, the Structured Risk Assessment, Forensic Version, to

---

[5] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000) (sometimes referred to as the DSM-IV-TR). Throughout this opinion, references to the fourth edition of the DSM are to the text revision of the fourth edition unless otherwise indicated.

[6] Prior to trial, the state moved to exclude any reference to the fifth edition of the DSM, which was in draft form at that time. The trial court granted the motion over an objection by Johnson that the exclusion would prevent him from adequately cross-examining the state's experts regarding the validity of the diagnosis of paraphilic coercive disorder. The court reasoned that the draft DSM had not yet been adopted and was subject to change. On appeal, Johnson does not argue that this ruling provides an independent basis for reversal.

select a reference group for Johnson and place his Static-99R score in context. Based on these two instruments, Dr. D'Orazio concluded that he falls into a high-risk group and has characteristics in common with men who have reoffended at a rate of 21 to 28 percent over a 10-year period. Dr. Padilla also used the Static-99R, as well as factors listed in another guided clinical assessment instrument, the Stable-2007, to estimate that Johnson had a 15.8 percent risk of recidivism over the next five years and a 24.3 percent chance of recidivism over the next 10 years.

Johnson's experts testified that his risk of reoffense was lower. Although, as did the state's experts, Dr. Abbott used the Static-99R, he concluded that Johnson fell into the "routine corrections offender group," which has a 6 percent chance of reoffense over a five-year period, with the chance declining about 2 to 4 percent per year. Unlike Dr. D'Orazio, Dr. Abbott did not use the Structured Risk Assessment, Forensic Version, to select a reference group, stating the instrument was experimental, and its reliability has never been tested. Dr. Heard testified that the current rate of sexual reoffense in the United States is 7 percent and that Johnson's risk was lower than that due to his age and declining sex drive. Dr. Heard did not use any sort of instrument or actuarial tool because he does not believe they provide accurate results.

The jury unanimously found Johnson to be an SVP, and the trial court imposed an indeterminate commitment. Johnson then filed a motion to strike the indeterminate commitment and to be given a two-year commitment instead, asserting that being held indefinitely would violate his constitutional rights. The court denied the motion.

II.

DISCUSSION

A.   *Johnson's Appeal.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B.   *Johnson's Habeas Corpus Petitions.*

Having rejected the arguments Johnson raises in his appeal, we turn to his petitions for habeas corpus. In the first, he contends that the state's case is completely undermined by two pieces of newly discovered evidence— specifically, the DSM-5, which was published in May 2013, and the declaration of Allen Frances, M.D., which was submitted with the

---

*See footnote, *ante,* page 80.

petition. In the second, he claims that the revisions to the DSM undermine the state's experts' testimony and render it " 'false evidence' " under Penal Code section 1473, subdivsion (e)(1). Essentially, both petitions ask us to conclude, in the context of a case in which competing expert testimony on the subject was presented without objection, that paraphilic coercive disorder can no longer be considered a valid mental disorder. We decline to do so.

■   We begin by observing that, in general, a person involuntarily committed under the SVPA may challenge the confinement through a petition for writ of habeas corpus. (§ 7250; *People v. Allen* (2008) 44 Cal.4th 843, 859 [80 Cal.Rptr.3d 183, 187 P.3d 1018]; *People v. Talhelm* (2000) 85 Cal.App.4th 400, 405 [102 Cal.Rptr.2d 150].) The restrictions on bringing the writ are typically discussed in the context of challenges to criminal imprisonment, but they apply equally to challenges to civil commitments. Important among these restrictions is that the writ does not lie "to retry issues of fact or the merits of a defense, . . . and the sufficiency of the evidence to warrant the [jury's determination] is not a proper issue for consideration." (*In re Lindley* (1947) 29 Cal.2d 709, 723 [177 P.2d 918].) And when a habeas corpus petition is based on a claim of newly discovered evidence, "[i]t is not sufficient that the evidence might have weakened the prosecution case or presented a more difficult question for the judge or jury." (*In re Clark* (1993) 5 Cal.4th 750, 766 [21 Cal.Rptr.2d 509, 855 P.2d 729].) Rather, newly discovered evidence justifies habeas corpus relief only when it completely undermines the entire structure of the state's case. (*In re Hall* (1981) 30 Cal.3d 408, 421–423 [179 Cal.Rptr. 223, 637 P.2d 690].)

■   A habeas corpus petition may also be based on a claim that "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person . . . ." (Pen. Code, § 1473, subd. (b)(1).) The Legislature recently amended section 1473 to expand the definition of false evidence to "include opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances." (Pen. Code, § 1473, subd. (e)(1), as amended by Stats. 2014, ch. 623, § 1.) Thus, both of Johnson's petitions ultimately turn on whether the new version of the DSM undermines the validity of a diagnosis of paraphilic coercive disorder.

■   Being an extraordinary remedy, the writ is not available when an alternative remedy is available. (*In re Clark, supra*, 5 Cal.4th at p. 764, fn. 3.) Seizing on this principle, the Attorney General argues that Johnson's petitions must be denied because Johnson could argue in a section 6608 proceeding that the DSM-5 requires his release. We are not persuaded. A section 6608 proceeding does not provide Johnson with an adequate remedy because

of the nature of both his claims, which involve whether the DSM-5 renders invalid the diagnosis upon which his commitment under the SVPA is premised. If this were found to be true, the alternative remedy of a conditional release under section 6608 would be inadequate because it would require him to continue supervision under a "forensic conditional release program" for at least a year, and it would require him to petition for an unconditional release. (§ 6608, subd. (g); see *id.*, subd. (m).) If Johnson truly never had a mental disorder qualifying him as an SVP, he would not properly be subject to these restraints (even though he still would properly be required to fulfill any remaining parole obligations).[12] Accordingly, section 6608 does not provide Johnson with an adequate alternative remedy.

We now turn to the merits of Johnson's petitions. According to Johnson, the drafters of the fifth edition of the DSM rejected a proposal from certain groups to clarify the fourth edition's language by including a specific diagnosis for paraphilic coercive disorder. He points out that the drafters also removed the passage in the fourth edition concerning nonconsenting persons and did not mention paraphilic coercive disorder when discussing conditions needing further research before being identified as official diagnoses.[13] Johnson contends that the upshot of these changes is that paraphilic coercive disorder can no longer be considered a valid mental disorder under the SVPA. Although we accept that the fifth edition may cast additional doubt on the validity of paraphilic coercive disorder, we cannot agree that it completely undermines the state's case or renders the state's experts' testimony false evidence.

■ The federal Constitution does not require an SVP's commitment to be based on a disorder that is uniformly recognized by the mental health community. In *Hendricks, supra,* 521 U.S. 346, the United States Supreme Court rejected the argument that Kansas's SVP act violated due process because it allowed commitment based on a " 'mental abnormality[,]' . . . a term coined by the Kansas Legislature, rather than by the psychiatric community." (*Id.* at pp. 357, 359.) The court observed, "[W]e have never required State legislatures to adopt any particular nomenclature in drafting civil commitment statutes. . . . As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, those definitions do not fit precisely with the definitions

---

[12] Section 6608 might provide an adequate remedy in some situations, such as where newly discovered evidence establishes that the SVP is no longer likely to reoffend. If accepted, such evidence would only justify a conditional release, and the section 6608 remedy therefore would be adequate.

[13] The of the DSM-5 still references a residual category of paraphilias, noting that "[m]any dozens of distinct paraphilias have been identified and named, and almost any of them could, by virtue of its negative consequences for the individual and for others, rise to the level of a paraphilic disorder."

employed by the medical community," which the court concluded was permissible. (*Id.* at p. 359.)

The Supreme Court later reaffirmed this principle in *Crane, supra,* 534 U.S. 407, another case involving Kansas's SVP act. The court rejected the argument that the statute required the state to prove an offender had a total or complete lack of control over his or her dangerous behavior. (*Id.* at pp. 412–413.) It also concluded that an offender could not be committed without any lack-of-control determination. (*Id.* at p. 413.) Although an alternative standard might be more precise, "the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules." (*Ibid.*) The court reasoned that "the States retain considerable leeway in defining the mental abnormalities and personality disorders that make an individual eligible for commitment" and that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." (*Ibid.*)

Following *Hendricks* and *Crane,* the Seventh Circuit Court of Appeals discussed the definitiveness of the DSM in particular in *McGee v. Bartow* (7th Cir. 2010) 593 F.3d 556. The petitioner in *McGee* challenged his involuntary civil commitment under an SVP statute, arguing that paraphilic coercive disorder was an invalid disorder because it was not specifically listed in the fourth edition of the DSM. (*McGee,* at p. 574.) The court ruled, "[W]e cannot adopt any rule that asks the DSM to do what the text itself professes that it was not intended to do: answer ultimate legal questions or create a perfect fit between law and medicine in the realm of involuntary civil commitment." (*Id.* at p. 576.) The court observed that regardless whether a diagnosis is accepted by the DSM, "the factfinder has the ultimate responsibility to assess how probative a particular diagnosis is on the *legal* question of the existence of a 'mental disorder'; the status of the diagnosis among mental health professionals is only a step on the way to that ultimate legal determination." (*Id.* at p. 577, original italics.) The existence of a professional debate over paraphilic coercive disorder does not mean that the diagnosis is " 'too imprecise a category' " such that it runs afoul of due process. (*Id.* at p. 570, quoting *Hendricks, supra,* 521 U.S. at p. 373 (conc. opn. of Kennedy, J.).) *McGee* concluded that "a finding of a 'mental disorder' does not violate due process even though the predicate diagnosis is not found within the four corners of the DSM." (*McGee,* at p. 576.)

■ We agree with these observations and conclusions and consider them to be equally applicable to the DSM-5. Even if the fifth edition reflects a growing skepticism in the psychiatric community about paraphilic coercive disorder, we cannot conclude that a commitment based on that

disorder violates due process, thereby completely undermining the state's case against Johnson. Similarly, we also cannot conclude that the fifth edition reflects scientific research that undermines expert testimony diagnosing that disorder and renders that testimony false evidence.[14]

Our holding might be different if the SVPA required an SVP's mental disorder to be specifically mentioned in the DSM. But it does not. The SVPA does not refer to the DSM, much less require an SVP's mental disorder be listed in it. (See § 6600, subd. (a)(1) [an SVP is someone with a "diagnosed mental disorder that makes the person a danger to the health and safety of others"].) Even the Court of Appeals of New York, one of the courts most wary of basing an involuntary civil commitment on a diagnosis of paraphilic coercive disorder, accepts that under its state's civil commitment statute "a mental abnormality 'need not necessarily be one so identified in the DSM' " since the statute "does not reference or require that a diagnosis be limited to mental disorders enumerated within the DSM . . . ." (*State v. Shannon S.* (2012) 20 N.Y.3d 99 [956 N.Y.S.2d 462, 980 N.E.2d 510, 514].)

As for Dr. Frances's declaration, it cannot even be considered newly discovered evidence or "later scientific research." (Pen. Code, § 1473, subd. (e)(1).) Dr. Frances is a professor emeritus of psychiatry at Duke University and was the chair of the task force that formulated the original fourth edition of the DSM. In his declaration, he states that the American Psychiatric Association has, over the past 24 years, consistently rejected the notions that the compulsion to rape could be conceived of as a mental illness and that the diagnosis of paraphilic coercive disorder should be used in forensic proceedings. He also opines, "It is obvious that Mr. Johnson is no more than a common criminal whose sexual violence was not due to a mental disorder and that he does not qualify for any diagnosis of Paraphilia." But other than its passing references to the DSM-5, the declaration simply elaborates upon the testimony of Johnson's experts below, who also questioned the legitimacy of a diagnosis of paraphilic coercive disorder. The declaration does not support Johnson's claims based on newly discovered evidence and false evidence.

We think it worth reiterating that the validity of paraphilic coercive disorder was fully litigated at Johnson's trial. Johnson did not object to the introduction of the state's experts' testimony on the subject, and he was able

---

[14] Courts in other states have continued to recognize paraphilic coercive disorder as a valid diagnosis despite the publication of the fifth edition of the DSM. (See, e.g., *In re Detention of Melcher* (Ill.App.Ct. 2013) 2 N.E.3d 1181, 1193–1195; *In re Cozart* (Mo.Ct.App. 2014) 433 S.W.3d 483, 490.)

to cross-examine those experts and present the testimony of his own experts.[15] (See *Brown v. Watters* (7th Cir. 2010) 599 F.3d 602, 612 [conclusion that diagnosis of paraphilic coercive disorder is acceptable is "strengthened where, as here, able assistance of counsel *actually did expose* the professional debate to the jury and substantial contrary professional opinions were offered" (original italics)].) Although the fifth edition of the DSM and Dr. Frances's testimony might have bolstered Johnson's arguments if introduced at trial, they do not completely undermine the state's case or render the state's experts' testimony false evidence. Regardless of the publication of the DSM-5, the record before us includes substantial evidence that paraphilic coercive disorder is a legitimate diagnosis and that Johnson suffers from it.

## III.

### DISPOSITION

The judgment is affirmed, and the petitions for a writ of habeas corpus are denied.

Margulies, J., and Dondero, J., concurred.

A petition for a rehearing was denied April 7, 2015, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 8, 2015, S225960.

---

[15] Because the testimony about paraphilic coercive disorder was introduced without objection, we need not decide how questions about the admissibility of expert testimony on that disorder should be handled by a trial court. Suffice it to say that the admissibility of expert testimony in California is typically evaluated under Evidence Code section 801, which requires the testimony to be related "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and to be "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject." In California, the admissibility of expert testimony about the diagnosis of mental conditions, including those not referenced in the DSM, is not governed by the *Kelly/Frye* test, which arose from *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013 and was adopted for use in California courts in *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]. (*People v. McDonald* (1984) 37 Cal.3d 351, 373 [208 Cal.Rptr. 236, 690 P.2d 709]; *People v. Ward* (1999) 71 Cal.App.4th 368, 373 [83 Cal.Rptr.2d 828].) The *Kelly/Frye* test requires a party seeking to introduce expert testimony relying on "a new scientific technique" to show "general acceptance of the new technique in the relevant scientific community" and the witness's qualification as an expert and use of "[the] correct scientific procedures" in employing the technique. (*Kelly*, at p. 30.)